## SAN ANTONIO PUBLIC SERVICE CO. v. FRASER et al.

### No. 1244.

Court of Civil Appeals of Texas. Eastland.
March 9, 1934.

Rehearing Denied April 6, 1934.

Templeton, Brooks, Napier & Brown, of San Antonio, for appellant.

Dielmann & Forster, of San Antonio, for appellees.

HICKMAN, Chief Justice.

The appeal is from a judgment in favor of Mrs. Rosie Fraser, surviving widow of Ray Fraser, and three daughters of Ray Fraser by former marriages, for damages for the death of their husband and father. At the time Fraser received the injuries which resulted in his death, appellant owned and operated the street car system in San Antonio. The two issues of negligence submitted to the jury and found against appellant were as follows:

"(1) Did defendant's conductor in charge of said street car, while Fraser was in the act of entering the car as a passenger, without notice to Fraser, cause the door of the car to be closed and the step thereby suddenly raised or lifted, thereby throwing Ray Fraser backward with great force and violence upon the ground or pavement?

"(1a) If you have answered 'Yes' to Question (1), but only if you have so answered same—then was defendant negligent in so doing?

"(2) On the occasion mentioned in the petition, did the defendant's servants or servant in charge of said car fail to keep the door of said car open and the step lowered for a sufficient length of time to enable Ray Fraser to enter the car?

"(2a) If you have answered 'Yes' to Question (2), but only if you have so answered the same—then was the defendant or its said servants or servant negligent in so failing?"

Each of these grounds of negligence was found to be the direct cause of the injuries and death of Ray Fraser, and the judgment rests upon these findings, together with a finding as to the amount of damages to be awarded. In the light of the evidence, these questions really submitted but one issue of negligence, viz., whether the conductor, while the deceased was on the step and in the act of boarding the car, turned a lever with such force as suddenly to lift the step and close the door, thereby throwing deceased backwards with great force and violence upon the pavement. The ground of negligence submitted in issue 2 has no particular meaning. There is no evidence that the door of the car was closed and the step raised before deceased reached same, and that he was injured because of that fact. The submission, therefore, of the issue of a breach of the negative duty to keep the door open and the step lowered for a sufficient length of time to enable the deceased to enter the car, in the light of the evidence, is merely submitting the first issue again in different language.

It is presented here, as it was in appellant's motion for a new trial, that the jury's affirmative answers to these issues are so against the great weight and overwhelming preponderance of the evidence as that they should not be permitted to stand. The question presented is, not that there was no evidence on these issues, but rather one of the sufficiency of the evidence to support the findings. The assignments call for a consideration of the testimony bearing upon the question of whether the conductor, by turning the lever, threw the deceased off the steps of the car. On this issue appellees offered one witness, Louis

Hering, who said he was on the sidewalk not far from the scene of the accident, and gave testimony as follows:

"Q. Just tell of your own knowledge what you saw. A. Well, the car stopped, and the green light was on—signal light—and as the man walked up there and got on, and that when the accident occurred, when he stepped on the step.

"Q. How, what did you see, just tell the jury exactly what you saw. A. Well, when the car stopped and the man started the car, at that time he had one foot on the platform, and the other foot then got ready—one foot on the step, and the other foot got ready to get on the platform, and they pulled the door shut, and gave one signal to be ahead, and after the accident happened, as soon as he fell, why they gave another signal to stop again.

"Q. Now, you say he had one foot on the step and was in the act of putting the other foot on the platform when the door step raised, you say? A. Yes, sir.

"Q. All right, he had one foot on the step and was in the act of putting the other foot on the platform. Just state now what happened in detail. A. Well, they pulled the steps up when they pulled the doors shut, and the steps—.

"Q. Then what happened? A. Well, he fell backward then, throwed the man off when the steps shut, flew up.

"Q. How did the man fall? A. On the back of his head, on his shoulders.

"Q. Did he fall forwards or did he fall backwards? A. Backwards.

"Q. Did you actually see the man fall? A. I did.

"Q. Was there any evidence of the fall on the street where he fell? A. A big puddle of blood.

"Q. Toward—to what side did he fall? A. Well he fell right straight back, his feet were laying—he was laying east and west when he fell.

"Q. Did it make a loud report or muffled sound, or what? A. Made a pretty loud noise when he hit the pavement, seemed like he fell back awful hard.

"Q. Now, from where you were standing, did you have an unobstructed view toward that back door where he tried to get on the car? A. I don't know—I could see it plain.

"Q. Was there anything between you and that door at all? A. No, not between me and the door.

"Q. And did he catch hold of that rod that runs up the middle of the door? A. Yes, sir.

"Q. He had one foot on the step? And where was the other foot? A. Getting ready to put on the platform.

"Q. Getting ready to put on the platform? He didn't have either one of his feet on the street, did he? A. No, sir.

"Q. But he had one foot on the step and the other foot almost to the platform? A. Yes, sir, he was putting it on the platform.

"Q. He was putting it on the platform? And had hold of the rod, did he? A. Yes, sir.

"Q. And, you say, the step was jerked up and the door was shut? Did you hear the signal for the street car to go ahead? A. Yes, sir.

"Q. And according to your judgment, Mr. Hering, about how far did the street car move before it stopped again? A. Well, it never did move, he pushed the bell, when, like a lot of them do, as soon as a man grabs hold of the rod they ring the bell to go ahead.

"Q. Well, I say, did the street car move at all? A. No, sir, never moved.

"Q. I thought you said a while ago it moved and stopped—stopped—it moved and then stopped? A. No, sir.

"Q. Did he give the signal to go ahead? A. Yes, sir.

"Q. And then gave the signal to stop; but the street car never did move? A. No, sir.

"Q. Have you the clear picture in your mind that the man had one foot on the step and the other foot was almost to the platform? A. Yes, sir.

"Q. All of his weight was upon it, is that correct—all of his weight was on the step? A. Well, I imagine when the steps got up, started raising, when he felt it raising, he put the other foot on the platform.

"Q. Well, I mean before it started raising, he had all his weight on the step? A. No, sir, not necessarily, he had his hand on the rod, was holding on to the rod.

"Q. He was holding on to the rod? A. Yes, sir.

"Q. You are sure of that, he was holding on the rod, are you? A. Yes, sir."

Roy Osborn Browne, the street car conductor, described the accident as follows:

"Q. Now, Mr. Browne, will you please tell us here in your own way how that accident happened—just tell us what happened to that man there? A. Well, we pulled up to the corner and made our regular stop; a fellow with

two bundles of groceries got on, I closed the door, and gave my motorman two bells, and he hesitated and gave me a bell, and I looked back then, and there was a man coming down along the side of the car—this fellow—and I gave a bell then which cancelled the two bells to go, threw my door open, and this fellow started—attempted to get on and fell backwards to the street, and hit the pavement with his head.

"Q. Well, as he attempted to get on, what were his acts, or what were his movements, as he attempted to get upon the car? A. Well, he stepped upon the first step, and kinder looked up and grabbed for the grab-handle and missed it, and kinder fell backward."

On cross-examination this same witness testified:

"Q. Isn't it a fact that when he put his second foot up on top to get on the platform there, you began closing the door? A. No, sir.

"Q. And that the raising of the step made him lose his balance and fall backward? A. No, sir.

"Q. Isn't it a fact that he fell back with great force? A. He fell back with pretty good force, yes sir."

On redirect examination he testified:

"Q. Mr. Browne, if a man is standing on that step on one foot, the other foot is coming up towards the platform, can you raise that step? A. No, sir.

"Q. With his weight on it? A. No, sir.

"Q. That is all."

Victor Carmin, an employee of appellant, who was a passenger on the street car, testified as follows:

"Q. When he tried to get on, were the doors closed on him or not? A. No, sir, they were not.

"Q. Well, tell us, please, what his actions were and what his movements were, as he tried to get on the car? A. Well, as I saw the thing, as a passenger on the car, the conductor—they had to load one passenger there at Commerce Street, and as this passenger entered the car, the conductor closed the door and gave two bells, and it seemed the motorman noticed a man coming towards the front end to get on, and he motioned to the back end and cancelled the conductor's two bells; the conductor opened—or cancelled the two bells and rang the motorman down and opened the doors, left the doors open for the man to get on, and as this man reached to catch hold of the upright, he fell flat on his back, never did catch that upright.

"Q. Did he catch hold of the rod? A. No, sir, never did touch it.

"Q. Did he fall backwards? A. He fell backwards, straight on his head."

E. C. Naeglin, a passenger on the back platform of the street car, testified as follows:

"Q. Now, will you please go ahead, Mr. Naeglin, and tell us what happened to this man there, in your own way, just tell us what happened to this man there, please? A. Well, he wanted to board the car—

"Q. Yes? A. —and he stepped up, and as he stepped up, he tried to reach for the bar to hold up there, and he missed that bar.

"The Court: And he—what, did what? A. Tried to reach for the support there on the car, to raise himself up.

"The Court: Yes, and what else? A. And he missed it.

"Q. And he missed it? A. Yes.

"Q. When he missed it, what happened there then? A. Well, he fell backward.

"Q. At the time he came up and reached for the rod, was the street car moving or standing still? A. Standing still.

"Q. And what was the position of the door at the time he reached for this rod. A. The doors were open."

Miss Alice Bauwens, who operated a business known as "Alice's Lunch Room" near where the accident occurred, gave the following testimony:

"Q. Miss Bauwens, this suit grows out of an accident which happened to a man on a street car there at Navarro Street, on the evening of June 29th, 1931. Were you present there at the time of the accident? A. Yes, sir.

"Q. And did you see the man before he tried to get on the street car? A. Well, I saw the man when he went on the street car.

"Q. Then, would you go ahead and tell us, now, in your own way, what happened there to this man—just tell these men like you wanted them to know what happened? A. Well, I looked outside the door, from the inside of the restaurant looked out, and I saw a man go on to the street car, seemed like he wanted to get on the step of the street car, reached for the—oh, that bar, you know, they have there, and he fell backward on the pavement.

"Q. When he did that, was the street car moving or standing still? A. No, the street car was standing still.

"Q. Did he catch hold of this bar when he

reached for it—did he catch hold of it or not? A. I couldn't tell you if he caught hold of it or not, I just know he was reaching for it, and I saw him fall backward, and I hollered when I saw him fall.

"Q. Did anything happen to the door or step as this man was reaching for this bar? A. No, sir."

In addition to these eyewitnesses to the accident, appellant put on the witness stand E. P. Arneson, a civil engineer, Lawrence McInerney, an engineer employed by appellant, and D. J. Knoupper, a mechanic and one of the proprietors of an automobile repair shop in San Antonio. Each of these witnesses described the mechanical construction of the levers and rods which enable the conductor, by turning a lever, to close the doors and raise the step on this particular car. The testimony was that this act was performed by levers, and that there were no complicated gears involved. Each of these witnesses conducted a separate experiment with the car the day he was placed on the witness stand to determine whether it would be possible for a conductor to apply sufficient force to raise the steps and thereby throw off a man standing in the exact position as that in which appellees' witness, Hering, and the conductor placed the deceased at the time of the accident, and each testified that it would be a physical impossibility to do so. No evidence contradicting this fact was offered, except that of the witness Hering above quoted.

 It thus appears that the answers of the jury depend for support on the evidence of the witness Hering. The fact alone that his testimony was contradicted by several other eyewitnesses would not cause us to set aside the jury's findings. We are not authorized to set aside a verdict on the ground that it is against the preponderance of the evidence. But something more than a mere preponderance of the evidence against the verdict exists in this case. These witnesses testified, in effect and without contradiction, that it would have been a physical impossibility for the conductor to have thrown the deceased off the steps in the manner testified to by Hering. The conductor gave like testimony. We cannot close our eyes to natural laws, but must take knowledge of the general principles of the lever. Giving due allowance for the testimony of Hering that deceased was holding on to the rod and was thereby probably lifting some of his weight, the inescapable conclusion, to our minds, is that the conductor could not have thrown him violently against the pavement by turning the lever. The physical facts speak so loudly that Hering was mistaken in his testimony that we are unwilling to permit the verdict to stand. A consideration of the mechanism employed for raising the step and closing the door convinces us that some cause other than that found by the jury produced deceased's injuries. We are not called upon to determine what that cause was.

The power of this court to set aside jury findings is one which we undoubtedly possess, but which we seldom exercise, but, where such findings are so against the great weight and overwhelming preponderance of the evidence as to be manifestly wrong, it is our duty to set them aside. Many authorities dealing with the question of the power and duty of the Courts of Civil Appeals in this particular are collated in the footnotes to 3 Tex. Jur. § 769.

A careful consideration of this testimony has led us to the conclusion that the trial court erred in overruling appellant's motion for a new trial, because of the insufficiency of the evidence to sustain the verdict. It is accordingly ordered that the judgment of that court be reversed and the cause remanded.

On Rehearing.

In the original opinion we stated that the witnesses who conducted experiments to determine whether the step of the car could be raised with a person standing thereon testified "that it would be a physical impossibility to do so." That is an inaccurate statement of their testimony. They testified to facts which convince us that it would have been a physical impossibility for the conductor to have thrown the deceased violently backward by turning the lever. We make this correction in the interest of accuracy. The facts covered by their testimony not only had reference to the experiments conducted by them, but also to the mechanical device by means of which the step was raised. As to this, there was no character of conflict in the evidence. To hold that the conductor could have thrown deceased backward in the manner testified by Hering by the use of the lever described in this record would violate physical laws. It would amount to saying that a lever can do more work than is done upon it.

We have carefully considered the motion for rehearing in the light of the record, but still adhere to the views expressed in our original opinion, and the motion is accordingly overruled.